Anthony D. Warner, a Minor, Plaintiff-Respondent-Appellant, v. William J. Basten, Defendant, and Charles May, Petitioner-Intervenor-Appellee.

Gen. No. 69–73.

Second District.

December 31, 1969.

Rehearing denied February 13, 1970.

ABRAHAMSON, J., dissenting.

Fritzshall and Fritzshall, of Chicago (Robert S. Fritzshall, of counsel), for appellant.

John F. Grady, of Waukegan, for appellee.

PRESIDING JUSTICE THOMAS J. MORAN delivered the opinion of the court.

This action is brought upon a petition to enforce an attorney's lien as provided under the Illinois Attorney's Lien Act (Ill Rev Stats 1967, c 13, § 14). The trial court, after hearing the testimony upon the petition and answer, found for the petitioner and ordered a lien and charge against all proceeds of the claim in question in the amount of 25% of any such proceeds, giving such lien priority over any other attorney.

The claim in question arises out of a truck-bicycle collision which occurred on September 22, 1968. On that date, William J. Basten operated a truck which struck a bicycle being operated, on the shoulder of a road, by

Anthony Warner. The circumstances surrounding the accident, as set out in the pleadings and the record strongly indicate liability on the part of Basten.

Anthony Warner, seven years of age, received serious internal injuries some of which required the removal of his right kidney and the surgical repair of his liver. The minor's father, Terry Warner, respondent, was riding a bicycle nearby and received a slight injury to his hand when struck by the truck. The respondent, a member of the U. S. Naval service, contacted the legal department at Great Lakes Naval Center and was referred to the chairman of the Legal Referral Service of the Lake County Bar Association. The Legal Referral Service, in turn, referred the respondent to Charles May, attorney at law and petitioner herein.

On October 7, 1968, the respondent met with the petitioner in the latter's office. During the meeting, in the presence of the respondent, the petitioner dictated a "memorandum to file" concerning the accident and prospective investigative and preparatory steps to be taken. Included in the memorandum, which was allowed into evidence, was a statement to the effect that the petitioner would charge 33⅓% of the sum recovered in the event suit were filed or 25% of the sum recovered in the event of settlement.

Upon cross-examination, with reference to the first conversation, the following testimony took place:

Q. "In this case. What was that conversation?"

A. "I told Mr. Warner that as a prospective client, I thought he should hear from me that our firm did on occasion represent insurance clients, but that if he saw fit to retain us, I could give him my full and complete assurance that it didn't matter who the case turned out to be against, I would devote my best efforts to he and to his son."

Q. "Did you tell him at that time that you were representing Maryland Casualty Company?"

A. "No specific reference was made that I had a case for Maryland Casualty. At that specific time we didn't have any idea whether Mr. Basten was insured with Maryland Casualty."

Q. "Did you tell him you would not be able to prosecute his claim, his son's claim if you found that you represented a company that you were involved with defense work in, or had represented before?"

A. "No, I specifically told him the opposite, that if I undertook to step into a case, it didn't matter whether or not in the past I had defended one of those insurance company clients, I would represent his son."

It appears that on the same day, after the meeting, the petitioner retained an investigator and undertook investigation of the case by visiting the scene with the respondent and the investigator; instructed the investigator as to the necessary photographs to be taken; went to respondent's home and photographed the bicycle involved; unsuccessfully attempted to contact Basten at his home; and instructed the investigator to canvass the scene of the accident for additional occurrence witnesses, as only one occurrence witness was known at the time. Subsequently, the petitioner, by telephone, informed the respondent that the photographs ordered were completed; that in addition to obtaining a statement from the known witness, the investigator uncovered three additional witnesses; that because of a conflict in the description of the truck, colored photographs of the same were obtained after several unsuccessful trips to the place of employment and the home of Basten. It was at this time that the petitioner again visited the home

■■■■■■■

of the respondent and informed him that Basten refused to give him a statement.

Thereafter, on October 25, 1968, the respondent visited the petitioner's office and further discussed the status of the case. Petitioner testified that, during this discussion, he recommended, in light of Basten's refusal to give a statement, that suit be filed immediately, the investigation having disclosed that there may have been a dramshop action based upon the possibility that Basten was intoxicated at the time of the accident and, further, that Maryland Casualty Company (Maryland), who insured Basten, refused to disclose their liability limits. Also at this meeting, the petitioner testified he informed the respondent that, instead of charging the usual $33\frac{1}{3}\%$ in the event suit is filed, his contingent charge would be 25%. This, he said, was based upon a new policy, placed in effect the day before, by the probate division of the court which limited attorneys' fees to 25% where representation was based upon a minor's interest.

On October 31, 1968, the petitioner and respondent, along with a court reporter, appeared at the traffic hearing involving Basten. After the hearing, the petitioner left town to attend a seminar; however, prior to leaving he had dictated a complaint for filing. Up to this point of time, there had been no expression of dissatisfaction made by the respondent to the petitioner concerning the handling of the case.

Upon his return, the petitioner received a letter dated November 1, 1968, signed by Mr. and Mrs. Warner, discharging the petitioner. The letter was as follows:

"Mr. May,

"My wife and I have discussed the progress of the case for Anthony quite thouroughly (sic) during the past few days. We have both agreed that we are not satisfied with the progress of the case at this point.

"It is our decision to engage a different lawyer to prosecute the case from this date.

"If you will submit a bill to me for your services, I will send the payment as soon as possible.

"Sincerely,
"Terry N. Warner
"Louisa J. Warner
"1303 Chippewa
"Wildwood, Illinois"

The trial court found that the petitioner had been discharged without cause. Respondent maintains that the court erred in this finding and that there existed sufficient cause because the petitioner failed to disclose to the client the fact that, in another matter, he represented Maryland which was the public-liability insurer of Basten.

The record discloses that, at the time of the instant hearing, the petitioner was handling one case at the request of Maryland. The record further discloses that the petitioner's firm represents only one insurance carrier on an exclusive basis, but represents other insurance carriers, including Maryland, only upon an infrequent occasion. Petitioner testified that he has engaged in more cases against Maryland than he has handled for them.

The trial court, after hearing the testimony of the petitioner and the respondent, found that the petitioner entered into a binding and valid contract with the respondent, as the father and next of friend of Anthony Warner, to represent the minor in a personal injury claim against Basten upon a contingent fee of 25% of any sum recovered by way of suit or settlement. The court found that the contract was fair and reasonable and understood by the respondent; that the petitioner had fully performed his obligation under the contract up to the time that he was discharged by the respondent and thereby prevented from rendering further service; that said

discharge was without cause; and that the petitioner had properly served a notice of attorney's lien in accordance with the provisions of the statute. Appeal is taken from these findings and the judgment in favor of the petitioner.

Respondent maintains that the court erred in finding that the petitioner was discharged without cause because the contract was void ab initio as against public policy due to a conflict of interest of the petitioner. In support of this point, respondent argues that the firm of which petitioner was a partner had in the past represented Maryland, the insurer of the defendant, and had, on occasion, personally handled the defense of an insured of Maryland.

The fact that the petitioner and the firm of which he was a partner had represented Maryland was first learned by the respondent at the hearing in January of 1969, about three months after the discharge. The record reveals the following, with regard to the petitioner and his representation of Maryland, as well as his practice: That the petitioner is principally a trial attorney dealing in bodily injury cases; between the years of 1952 and 1956, while practicing alone and before becoming associated with the present firm, 15% to 20% of his practice was composed of the prosecution of cases on behalf of plaintiffs, while 75% to 80% of his practice was composed of the handling of the defense of bodily injury claims on behalf of insurers; that since 1960 to the date of the hearing, 75% to 80% of his practice is concerned with the prosecution of plaintiffs' cases, while the balance is on behalf of the defense of persons for insurers. In the present firm there are three to four lawyers engaged in trial work who do handle the representation of insurance cases and the defense of bodily injury claims.

To the best recollection of the petitioner, he was, at the time of the hearing, defending the Waukegan Park District at the request of Maryland, its insurer. He re-

called three cases since 1960 wherein he represented plaintiffs against Maryland and in each of those cases effected a settlement against Maryland's insureds. In 1966 he filed suit against an insured of Maryland while, at the same time, he was defending the Waukegan Park District in the case above mentioned.

The petitioner did not know whether any other members of the firm had other cases against Maryland at the time of this hearing.

The petitioner also testified that it is a common practice in Lake County for attorneys to represent personal injury claimants as well as be retained by various insurance companies. To the best of his own personal experience and knowledge, he knew of only one attorney officing and practicing in the county who restricted his practice solely to the prosecution of plaintiffs' personal injury cases. He also testified that there was nothing unusual about a trial attorney handling cases (not the same case) both for and against the same insurance company, except in those instances where there may be a precise agreement between the attorney and a particular company which he represents on an exclusive basis. He also testified that virtually no insurance company gives all their work to any one particular firm in the county but divides it among a number of attorneys and firms.

Neither counsel is able to cite any precedent setting forth the exact situation placed before us.

The case of In re Paders, 250 App Div 418, 294 NYS 252, relates to a disciplinary proceeding against an attorney who was the wife of an officer of a casualty company. It appears from the opinion that the attorney's husband was the officer of a casualty insurance company which insured a bus company. When a collision occurred between a bus and another vehicle the injured persons, or their representatives, were brought to the office of the casualty company, where the attor-

ney's husband advised them that they had a claim against the party whose vehicle had collided with the bus. The people were then sent to the respondent in an obvious effort to escape liability on behalf of the bus company and so benefit the casualty company. The casualty company conducted the investigations and often effected the execution of the retainers. From time to time, the attorney represented the bus company in the settlement of infants' claims against the assured company.

The court held that it was improper for the wife of an officer of the casualty company, and one who represented it from time to time, to take a retainer from anyone who had an interest which might or did conflict with that of the casualty company. The facts in that case make it inapposite to the situation at hand.

Likewise the disciplinary proceeding set out in the case of Kelly v. Greason, 23 NY2d 368, 296 NYS2d 937, 244 NE2d 456, does not precisely control. In this case two attorneys, Whalen and Kelly, were engaged in a partnership. Whalen was an adjuster for Nationwide Insurance Company employed by that company while so engaged in the practice of law. The partnership handled matters referred to them by Nationwide employees, chiefly medical payment claims under Nationwide's policies. With one exception, no negligence liability claims against Nationwide for such assureds were ever handled by them. However, several negligence liability claims against Nationwide were handled for claimants who had been referred by automobile repairmen and others not associated with Nationwide. Nationwide had full knowledge of the practice of Kelly and Whalen.

The New York Court of Appeals observed that the representation of conflicting or adverse interests may constitute misconduct because a lawyer is charged with a high degree of undivided loyalty to his client; that, with rare and conditional exceptions, the lawyer may not place himself in a position where a conflicting interest

may give the appearance of affecting the obligations of the professional relationship; that in those rare and exceptional situations where there may be a potential conflict, the lawyer must disclose to all affected parties the nature and extent of the conflict and obtain their consent to the continued representation.

The court held that it was prima facie evidence of professional misconduct for the partnership to represent claimants, whether assureds of Nationwide or not, in their claims against the carrier, while at the same time Whalen was also the carrier's paid employee. The case was remanded for the taking of further evidence with the admonition that if it should appear that Whalen's relationship to Nationwide as its adjuster was such that, even as to claims not assigned to him, he was charged with a duty to protect its interests, there would be no effective consent by the clients.

In the matter at hand there is no employment as an employee of any member of the petitioner's firm. It appears from the only witness that testified to this question, without contradiction, that the employment of the firm or the petitioner by Maryland was occasional in nature. The petitioner has been adverse to Maryland more times than he had represented its assured.

The argument of respondent carries with it an assumption that an attorney who has, occasionally, represented the insurer of a prospective defendant, might compromise his client's interest in an effort to ingratiate himself with the insurer.

Canon 6 of the American Bar Association's Canons of Ethics prohibits an attorney from representing conflicting interests except after giving full disclosure of the facts, in that an attorney should not place himself in a position to contend for that which duty to another client requires him to oppose. The canon also requires him to disclose to the client that which might influence the client in the selection of counsel.

Rule 6–101 of the Code of Professional Responsibility, recently adopted by the American Bar Association, prohibits an attorney from accepting employment when the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or personal interests.

It is the judgment of this court that there did not exist any conflict that would make the representation of this claimant, by the petitioner or his firm, professionally reprehensible or void. The realities of the practice of law and in particular the practice in litigated matters are that many of the more active and notable members of the trial bar start their practice with the representation of assureds for insurance companies. Many of these practitioners gravitate to the representation of claimants and still occasionally represent assureds at the request of insurance companies. This does not, in and of itself, automatically create a conflict of interest.

■ As the record in this case reflects, a diligent counsel will be diligent without regard to the status of his client. There is no evidence herein to suggest that petitioner was indifferent in the handling of the case, or failed to disclose any possible conflict, but rather the record reflects that petitioner, at the time of the initial visit of the respondent, discussed with the client the fact that he had represented insurance companies in the past and present but, notwithstanding, he would do his utmost for the claimant. Furthermore, petitioner appears to be equally accessible to claimants as well as insurers.

The suggestion that trial attorneys are either "Plaintiff" or "Defendant" is not the fact of the practice, although many attorneys do represent plaintiffs or defendants primarily, at given times in their practices. To freeze trial counsel into such polarities is to deny them one of the rewarding challenges of their profession and denies, to both the plaintiffs and defendants of this State, thoroughly trained and free representation. We

find no merit, under the circumstances of this case, to the respondent's contention.

It is next argued that the court erred in finding a valid contract because there was a mistake as to the terms and conditions and there was no meeting of the minds. The trial court specifically found a contract existed. The petitioner testified that on the same day he first talked with the respondent, he went to the scene of the accident with an investigator; that on three separate occasions he visited the home of the respondent in the company of an associate or the investigator for the purpose of seeking photographs or giving him a report on the progress of the case. On two other occasions the respondent met with the petitioner in his office and the petitioner appeared on behalf of the respondent at the traffic hearing against the defendant. The respondent testified that he understood that the fee would be 25% of the settlement and that he found it necessary to discharge the petitioner, in his own mind, because he and his wife had decided to "shop" for another lawyer. His letter discharging the petitioner states that he had decided to engage a different lawyer to prosecute the case from that date and requested a bill for services to be forwarded. We feel there is abundant evidence in the record to indicate that the parties understood the amount of the fee as well as their respective duties and obligations.

 An agreement for a contingent fee can never be implied but must be a matter expressly contracted for between the attorney and the client. Sullivan v. Fawver, 58 Ill App2d 37, 42, 206 NE2d 492 (1965). It is clear from the evidence that no other arrangement other than a contingent fee arrangement was discussed, and both parties understood. The fact that the injured party was a minor does not invalidate the contract. A contingent fee contract for the recovery of an award for personal injuries to a minor, entered into on behalf of

431

the minor by his parents or next friend, has long been recognized as enforceable unless it appears from the proof that it was an unreasonable amount. Goldberg v. Perlmutter, 308 Ill App 84, 87, 31 NE2d 333 (1941); Caruso v. Pelling, 271 Ill App 318, 322 (1933).

It is next contended that the court erred in finding a binding contract because the petitioner failed to disclose that he was handling cases for the insurance company which carried the coverage on the defendant's vehicle, and that such disclosure was a condition precedent of any contract.

██ ██ Because contingent fee contracts do have the practical effect of giving an attorney a pecuniary interest in the successful prosecution of litigation and because such contracts sometimes lead to solicitation and otherwise bring disrepute to the law, they are closely scrutinized by the courts. This is true without regard to whether or not the contract was entered into during the attorney-client relationship or before the relationship. In any event a contingent fee contract is always subject to the supervision of the courts as to its reasonableness. Pocius v. Halvorsen, 30 Ill2d 73, 83, 195 NE2d 137 (1963).

██ ██ Certainly the conduct of the attorney should be beyond suspicion and there must be a full and fair disclosure made to the client. At the same time a client having entered into such a contract with an attorney, owes the duty to be fair, reasonable and abide by his contract. Respondent maintains that the petitioner told him that if it turned out that the petitioner represented the insurance company of Mr. Basten, he would be unable to handle the case. He also testified that he understood that the petitioner would withdraw from the case under these circumstances.

During trial in January of 1969, the respondent testified that the first time he knew that petitioner or his

firm represented the insurer of Basten was at the hearing on this petition. On cross-examination the respondent stated that if he had known that petitioner or his firm may have, on occasion, represented Maryland, it would have been one of the reasons for having discharged him on November 1, 1968.

The testimony is without conflict that, at the initial meeting, petitioner advised the respondent that he or his firm, upon occasion, represented insurance companies. Neither party knew the insurer of the defendant at the time. Petitioner testified that he assured the respondent that if he undertook to step into the case it would not matter whether he had, in the past, defended one of the insurance company's clients; that he would represent the respondent's son and would devote his best efforts to his case.

There is nothing in the testimony or evidence of the case to indicate any consideration of a condition precedent to the contingent contract. At the time that the respondent discharged petitioner, he did not know whether or not petitioner or his firm had ever represented the insurer of Basten. The evidence and conduct of the parties does not raise or support his contention.

It is claimed that the court erred in admitting petitioner's Exhibit No. 1 which was a document entitled "memorandum to the file." It appears that at the time of the initial conference with the respondent, the petitioner dictated, on an office dictating machine, information regarding the occurrence, the injuries and the steps that would be taken. This memorandum to the file was attached to the petition as Exhibit B.

Petitioner testified that he dictated the entire memorandum in the respondent's presence; that the belt upon which it was dictated was transcribed by his secretary and that after it was transcribed, he read it; that the written transcription prepared by the secretary truly

and correctly reflected what he had dictated in the presence of respondent. Furthermore, it appears that the memorandum to the file had been forwarded to the respondent as an enclosure to a letter written by petitioner on November 5, 1968. The respondent, upon examination by his own attorney, stated that the two pages which composed the memo did not comprise the complete conversation that he had with petitioner on that day but only what he dictated on the machine after they had discussed it quite a bit.

The memorandum was made contemporaneously with the transaction, its transcription verified by the person who prepared it; the parties against whose interest the document would apply, identified it and stated that it was done in his presence. The record reflects that the witness was referring to the memorandum while he testified on direct examination before it was marked as an exhibit. We therefore hold that it was properly admitted into evidence. Healy v. City of Chicago, 109 Ill App 2d 6, 11–13, 248 NE2d 679 (1969); Waring v. F. W. Woolworth Co., 32 Ill App2d 7, 13–15, 176 NE2d 700 (1961); Chambers v. John T. Shayne & Co., 32 Ill App2d 16, 26–27, 176 NE2d 645 (1961), app den 21 Ill2d 621.

The final contention of the respondent is that the judgment of the court is against the manifest weight of the evidence. A court of review should not substitute its judgment for that of a trial judge who heard and saw the witnesses and where there is sufficient evidence upon which to base his findings. Sawchyn v. Samlow, 109 Ill App2d 363, 370, 248 NE2d 763 (1969).

A thorough review of the record in this case leads us to the conclusion that there was sufficient evidence upon which the trial court based its decision and therefore hold that the judgment entered was not against the manifest weight of the evidence.

It is elementary doctrine that a client has an absolute and unconditional right to discharge his attor-

434

ney at anytime without regard to whether the fee arrangement between them is contingent, quantum meruit, per diem or any other reasonable basis. The question of valid cause for the discharge goes to the right of the attorney to compensation. In other words, an attorney who is without fault can nevertheless be discharged, subject only to the client's obligation to compensate the attorney for services theretofore rendered, either on a quantum meruit or according to an express contract, if any, between the parties. Miller v. Solomon, 49 Ill App 2d 156, 167, 199 NE2d 660 (1964); DeKorwin v. First Nat. Bank of Chicago, 155 F Supp 302, 305–306 (1957).

██ When an attorney is discharged by the client without good or reasonable cause, rendering it impossible for the attorney to perform his contract of employment, the client is bound to compensate the attorney in accordance with his contract. This rule is nonetheless valid in those cases where the attorney, discharged without cause, is acting on behalf of a minor in the prosecution of a personal injury claim pursuant to a contingent fee contract. Caruso v. Pelling, supra, pp 323–324; Goldberg v. Perlmutter, supra, pp 90–91.

For the reasons stated herein, the judgment of the trial court is affirmed.

Judgment affirmed.

SEIDENFELD, J., concurs.

ABRAHAMSON, J., dissenting.

ABRAHAMSON, J., dissenting:

Although the majority opinion here appears to be in accordance with case law, I conclude that under the rules of the Circuit Court of Lake County the contingent fee on personal injury cases is limited to 25% where a minor is involved.

A client unquestionably has the right to discharge his attorney at will and engage another. Goldberg v. Perlmutter, 308 Ill App 84, 31 NE2d 333.

There is no question in the instant case but there were two sets of attorneys employed on a contingent fee basis of 25%. There is a minor involved and I conclude, in keeping with Phelps v. Elgin, J. & E. Ry. Co., 37 Ill App2d 46, 184 NE2d 799, that the minor's estate cannot be charged with two fees of 25% for each attorney and that the only equitable solution to the problem is that the fees be divided amongst the two sets of attorneys according to the efforts expended by each of them in obtaining the settlement.